

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00182-CV

———————————————

SCI FUNERAL SERVICES, LLC, Appellant

V.

JEFFREY MOSS, Appellee

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-304210-18

---

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant SCI Funeral Services, LLC fired Appellee Jeffrey Moss—a jury was asked to determine why. SCI claimed that it had fired Moss for undisputed comments that he made to a subordinate employee suggesting that she take before-and-after photographs of her breast-reduction surgery to post on SCI's intranet site. But Moss claimed that SCI had discriminated against him because he was a white male who refused to overlook the performance issues of his "toxic" black female subordinate. A jury found in Moss's favor, and SCI challenges that judgment, arguing in part that the evidence was legally insufficient for a reasonable jury to conclude that SCI's proffered reason for firing Moss—his breast-photo comment—was a pretext for its discriminatory motivations. We agree and will reverse and render.

## I. Background

Moss, a white male, was a salesman for SCI, and in June 2017, he relocated to the company's Arlington funeral home to manage that location's sales team.[1] In his new location, Moss reported to the Arlington funeral home's general manager, Casey Rose, who handled operations and personnel matters.

---

[1]SCI owns funeral homes and cemeteries that "provide services to client families before, during, and after a death." At the time of trial, the company had more than 40 locations in the Dallas–Fort Worth area.

## A.    Friction with Tina

Soon after Moss's move, he and his assistant manager, T.P. (Tina)[2]—a black female—began to butt heads.  According to Moss, Tina not only made inappropriate comments but also attempted to undermine the sales team's performance.

Regarding Tina's comments, Moss reported that, on his second day at the Arlington funeral home, Tina asked him if he had ever cheated on his wife, and she suggested that it was "really easy to get away with."  On another occasion, Moss claimed, a saleswoman reported to him that Tina had made a suggestive comment about wanting to sleep with a male coworker during a team business trip to Las Vegas.[3]  Moss passed on that report to Rose, who contacted the director of SCI's human resources department, Virginia Brown.  Rose and Brown spoke with several

---

[2]Because Tina is not a party to this proceeding and her medical information is divulged in this appeal, we use a pseudonym to protect her privacy.  *Cf.* 2d Tex. App. (Fort Worth) Loc. R. 7.

[3]No witness testified to the precise substance of Tina's alleged Vegas comment. The saleswoman who allegedly reported the comment denied that it had occurred, Moss's attempt to describe it was excluded as hearsay, and Rose recalled merely "something about what happens in Vegas[] stays in Vegas."  However, Moss's counsel's opening statement effectively presented Tina's alleged comment to the jury anyway, and both sides suggested the comment's substance in their witness questions by referencing—often in a hypothetical—"an assistant manager saying, I sure hope I'm not on my period when we go to Las Vegas on this work trip because what happens there, stays there."

sales team members, but they were not able to corroborate Moss's relayed report,[4] and Tina denied making the Vegas comment. Either way, nothing came of it, and Moss recalled Brown's minimizing Tina's comment as "girl talk among girls."

Moss's dominant issue with Tina, though, was her "blatant insubordination toward everything [he] said or did or tried to do." According to Moss, Tina regularly arrived late, ignored his directives, gave team members instructions that conflicted with his own, and generally tried to "undermin[e the] team." Moss complained about Tina's insubordination not only to Rose but also to Rose's colleague, Andrew Spiller, who handled regionwide sales issues for SCI and whom Moss had known before his move to Arlington.[5] Moss even lodged his complaints in the presence of Rose's and Spiller's bosses on the corporate ladder, Cary Grossi and James Rosson. But, by Moss's account, he was thrice told that SCI was "not going to move [Tina], and [it was] not going to fire her because she's a black female" and "will sue." Moss later remembered Rosson asking, "How is it going to look when three 50-something[-]year[-]old white guys fire a black woman[?]"

---

[4]Even the saleswoman who allegedly reported the Vegas comment to Moss later testified that no such comment or report had occurred.

[5]Spiller had recommended Moss for the sales manager position in Arlington.

**B.      Comment and Termination**

Moss's tense relationship with Tina continued during his three-month tenure at the Arlington funeral home.   After Tina requested an extended leave period to undergo a medical procedure, namely, a breast-reduction surgery, Moss made his comment about the before-and-after photos, which is at the heart of this case.

Although accounts vary as to the precise wording of Moss's comment, it was undisputed that, one morning in August 2017, Moss suggested to Tina that she take before-and-after photos of her breast-reduction surgery and post the photographs on SCI's intranet site.   Moss admitted making this comment, but he denied that it had been inappropriate.[6]   He claimed that Tina had been open about her breast-reduction surgery, that he had "never used the word[] breasts" but merely "insinuated" by referencing her surgery, and that he had made the comment offhandedly as they were walking into a meeting.   Four other members of the sales team remembered the

---

[6]Moss gave conflicting opinions regarding the appropriateness of his comment. On direct examination, he testified that his comment was "inappropriate, but [that] the reason [he] sa[id] that[, i.e., that it was inappropriate, wa]s because [of the] six years of what [he had] been through" rather than because of the comment itself. Then, on cross-examination, Moss testified that he had "d[one] nothing wrong." And when SCI confronted him with his prior acknowledgement of having "made an inappropriate comment," Moss reiterated that he had not done anything inappropriate.   Yet, at the same time, Moss acknowledged that his breast-photo comment had warranted some type of disciplinary action by SCI.

circumstances differently, though, recalling that Moss made his breast-photo comment to a room full of people as part of a sales team meeting.[7]

Regardless of the comment's precise context, one of the saleswomen on Moss's team reported his breast-photo comment to Rose, and Rose requested written accounts from several meeting attendees, including Tina. After receiving the written accounts via email, Rose scheduled a meeting with Moss—as well as Spiller, Grossi, and Rosson—for the following business day.[8] At that less-than-ten-minute meeting, Rose asked Moss if he had made the comment, and when Moss admitted it, Rose fired him. Rose later explained that the breast-photo comment had been the sole reason for Moss's firing, stating that "[i]t was very clear that [Moss] had committed gross misconduct and had embarrassed himself and the company . . . and needed to be terminated immediately." Rosson and Spiller supported the termination decision for the same reason.

---

[7]The sales team members described additional, related comments that Moss made at or near the time of the meeting, but Moss did not acknowledge making such comments, and the jury's verdict indicates that it believed Moss's version of events. *See Bell Helicopter Textron, Inc. v. Burnett*, 552 S.W.3d 901, 913 (Tex. App.—Fort Worth 2018, pet. denied) (recognizing that the factfinder "is the sole judge of the credibility of the witnesses").

[8]The comments occurred on Thursday, August 31; Rose received the written email statements on Friday, September 1; and he scheduled the termination meeting for Tuesday, September 5, which, due to an intervening holiday weekend, was the next business day.

6

## C. Post-Termination Developments

Meanwhile, a few months after Moss's termination, another woman at SCI complained to her manager that Tina had been spreading rumors of sexual encounters between the woman and a male colleague—the same male colleague whom Tina had allegedly referenced in her prior Vegas comment. Rose was on medical leave at the time, so Grossi and Brown talked to the relevant parties and confirmed that Tina had been engaging in "inappropriate conversations" and spreading "malicious[ and] false" rumors. As part of the investigation, Grossi met with Moss's replacement: Shelby Handley-Jones.[9] Handley-Jones—a black female—raised some of the same complaints that Moss had raised, such as Tina's vocal disagreement with management decisions. Ultimately, Grossi recommended firing Tina for violating SCI's policies by creating a "hostile work environment and [engaging in] behavior unbecoming of a manager." Handley-Jones acted on the recommendation and fired Tina.

Later, though, Handley-Jones herself was fired. Although the timing and circumstances of Handley-Jones's termination are unclear, Rose attributed her firing to her making false statements to him and "on official company paperwork."

---

[9]The correct spelling of Moss's replacement's last name is unclear. She did not testify at trial, and some trial exhibits spell her last name "Handly-Jones" while other exhibits spell her name "Handley-Jones." The parties' filings jump back and forth between these two spellings as well. We follow the spelling that was associated with the replacement's employee number in SCI's internal system: "Handley-Jones."

## D.    Litigation

Moss sued SCI, claiming that his termination had been motivated by race and sex discrimination in violation of the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. § 21.051. At the jury trial that followed, Moss testified to his bosses' remarks regarding not disciplining or firing black females, and he offered detailed evidence of the tension between him and Tina. Moss also emphasized SCI's failure to conduct "any real investigation" of his breast-photo comment, arguing that "the company was just looking for an excuse to get rid of [him]" because "[s]omebody[ had] to go, and it[ was] not going to be [Tina]."

SCI, meanwhile, emphasized that Moss had acknowledged making the breast-photo comment and that the comment had been confirmed by multiple meeting attendees, four of whom testified. Rose, Spiller, and Rosson told the jury that the breast-photo comment had been the sole reason for Moss's termination.[10] And they denied having ever stated that they would not fire black females, noting that both Tina and Handley-Jones had ultimately been fired. But Moss called these denials into question by highlighting that, in Spiller's deposition, he had acknowledged considering the "optics" of workplace disputes between white males and black females.

---

[10]Grossi did not testify.

## E. Verdict and Judgment

The jury returned a verdict in Moss's favor on his discrimination claims, finding that Moss's race and sex had been motivating factors in his termination and that he would not have been terminated otherwise.[11] The trial court entered judgment in accordance with the verdict, awarding Moss nearly $200,000 in back pay, $300,000 in noneconomic damages,[12] approximately $175,000 in trial attorney's fees, and conditional appellate attorney's fees.

## II. Discussion

In two overlapping issues, SCI challenges the legal sufficiency of the evidence to show that Moss's race or sex was a motivating factor in his termination and that the breast-photo comment was merely a pretext for discrimination.[13]

---

[11]Moss sought to recover for retaliation as well, but the jury found against him on that claim, and Moss does not appeal.

[12]The jury awarded $400,000 in noneconomic damages, and the trial court reduced the award to $300,000 in accordance with the relevant statutory cap. *See* Tex. Lab. Code Ann. § 21.2585(d)(4).

[13]SCI raises parallel factual sufficiency challenges, but because SCI's legal sufficiency challenges provide it the greatest relief and we resolve those challenges in its favor, we need not address the factual sufficiency challenges. *See* Tex. R. App. P. 47.1; *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201–02 (Tex. 2003) (op. on reh'g) (reiterating that "[f]or reasons of judicial economy . . . when a party presents multiple grounds for reversal of a judgment on appeal, appellate courts should first address issues that would require rendition").

## A.      Standard of Review and Governing Law

The TCHRA prohibits an employer from "discharg[ing]" an employee "because of" the employee's "race . . . [or] sex."[14]  Tex. Lab. Code Ann. § 21.051(1). Though TCHRA claims of race or sex discrimination are often analyzed under the *McDonnell Douglas* framework at the summary judgment stage,[15] when a discrimination

---

[14]The TCHRA reflects "the Legislature['s] 'inten[t] to correlate state law with federal law in employment discrimination cases,'" so "we look to federal law to interpret the [statute's] provisions." *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (quoting *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)).

[15]"Before a case [has been] tried on the merits, and in the absence of direct evidence of discrimination, we use the *McDonnell Douglas* burden-shifting framework to evaluate whether a plaintiff has created a fact issue on h[is] statutory claim." *Tex. Tech Univ. Health Scis. Ctr.—El Paso v. Flores (Flores II)*, No. 22-0940, 2024 WL 5249446, at *3 (Tex. Dec. 31, 2024); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25 (1973); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).  Under that framework, (1) the plaintiff has the initial burden to present a prima facie case; (2) the burden then shifts to the defendant to establish a nondiscriminatory reason for the adverse employment action; and (3) the burden then shifts back to the plaintiff to show that the nondiscriminatory reason was a pretext. *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir. 2021); *Flores II*, 2024 WL 5249446, at *3; *Tex. Tech Univ. Health Scis. Ctr.—El Paso v. Flores (Flores I)*, 612 S.W.3d 299, 305 (Tex. 2020).

For the plaintiff's prima facie case, *McDonnell Douglas* does not "establish an immutable list of elements," and such elements "vary depending on the circumstances." *Flores I*, 612 S.W.3d at 305; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 638–39 (Tex. 2012).  Generally, though, in a race- or sex-discrimination case, a plaintiff must show that he (1) is a member of one or more classes protected by the TCHRA; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by or otherwise treated less favorably than a similarly situated member of the opposing class. *See Ross*, 993 F.3d at 321–22; *AutoZone*, 272 S.W.3d at 592; *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917; *Univ.*

case has been fully tried on the merits, the focus shifts to the ultimate question before the jury: whether the plaintiff's race or sex was a "motivating factor" for his termination, even if other factors also motivated the termination. *Id.* § 21.125(a); *Wal-Mart*, 121 S.W.3d at 739; *Bell Helicopter*, 552 S.W.3d at 914. In answering this question, the jury "considers the credibility of the employer's reasons for termination and whether those reasons were a pretext for unlawful discrimination." *Bell Helicopter*, 552 S.W.3d at 914 (noting that pretext is relevant not only in the summary judgment context but also in a fully litigated case); *see Wal-Mart*, 121 S.W.3d at 739–40 (considering pretext within motivating-factor analysis).

To assess the legal sufficiency of the evidence to support a jury finding that race or sex was a "motivating factor" in an employee's termination, we consider the evidence in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have disbelieved. *AutoZone*, 272 S.W.3d at 592; *Wal-Mart*, 121 S.W.3d at 739; *Bell Helicopter*, 552 S.W.3d at 912–13. Although we indulge every reasonable inference in favor of the verdict, a jury "may not, from meager circumstantial evidence, reasonably infer an ultimate fact, none more probable than another." *Baker Hughes Oilfield Operations, Inc. v. Williams*, 360 S.W.3d 15, 21 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (reviewing race-discrimination case after

*of N. Tex. Health Sci. Ctr. v. Paul*, No. 02-22-00305-CV, 2023 WL 4779480, at *3 (Tex. App.—Fort Worth July 27, 2023, no pet.) (mem. op.).

jury trial and stating that "there must be a logical and rational connection between the facts in evidence and the fact to be inferred"); *see Bell Helicopter*, 552 S.W.3d at 913 (noting that circumstantial evidence supports a finding if "the fact may be fairly and reasonably inferred from other facts proved in the case"). "[W]hen the evidence offered to prove [the] vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Bell Helicopter*, 552 S.W.3d at 913; *see City of Keller v. Wilson*, 168 S.W.3d 802, 813–14 (Tex. 2005) (explaining that evidence is legally insufficient "if jurors would have to guess whether a vital fact exists" and that "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred").

## B.    No Evidence that Discrimination was Motivating Factor

SCI argues that there was no evidence that its decision to fire Moss was motivated by his race or sex rather than solely by his breast-photo comment. It emphasizes Moss's failure to identify a comparator—a similarly situated individual outside his class who was treated differently, *see Ross*, 993 F.3d at 322–23—and it asserts that this failure undermined his claims. Moss, meanwhile, argues that, though the *McDonnell Douglas* framework may have required a comparator at the summary judgment stage, a comparator was not required to support the jury's verdict, and he could show SCI's discriminatory intent through other evidence.

But whether a comparator was required or not, the record reveals that Moss did, in fact, rely on one. And neither this comparator evidence nor Moss's other, non-comparator evidence allowed the jury to reasonably infer that Moss's race or sex was a motivating factor in his termination.

### 1. Comparator Evidence

Although Moss denies that he was required to identify a comparator, in truth, his case relied on one: Tina.[16] Moss repeatedly contrasted his treatment with that of Tina, detailing for the jury how Tina's inappropriate conduct was intentionally ignored because she was a black female while he, a white male, was fired for his conduct. Moss makes this argument on appeal as well, listing Tina's many overlooked misdeeds as evidence that SCI's actions were influenced by race and sex.

But the evidence conclusively established that, legally speaking, Tina did not qualify as a comparator. To rely on a theory of disparate discipline—as Moss implicitly did—he was required to show that the undisciplined employee's situation and conduct were "nearly identical" to his. *Id.*; *see AutoZone*, 272 S.W.3d at 593–95; *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917–18; *Herbert v. City of Forest Hill*, 189 S.W.3d

---

[16]In a pretrial hearing, Moss argued that he was "not comparing how Mr. Moss was treated with how [Tina] was treated" but was instead comparing his treatment to that of Handley-Jones. But in a post-trial brief, he argued that comparators were not required and that, if they were, both "Ms. Handley-Jones and [Tina] were comparators." Now on appeal, Moss does not label anyone as a comparator and instead argues that comparators were not required.

369, 376 (Tex. App.—Fort Worth 2006, no pet.). And "[e]mployees with different responsibilities[ or] supervisors . . . are not considered to be 'nearly identical'" for purposes of a discrimination claim. *AutoZone*, 272 S.W.3d at 593–95 (holding plaintiff's proffered comparators were not similarly situated and reversing age-discrimination verdict). Here, the evidence conclusively established that Tina—a subordinate who reported to Moss—did not have the same supervisor or responsibilities as Moss.[17] *See Ross*, 993 F.3d at 322–23 (rejecting five proffered comparators in race-discrimination case because "those individuals had substantially different job responsibilities, [so] they d[id] not qualify"). She was not a comparator as a matter of law, and Moss could not avoid this legal reality by declining to use the "comparator" label while continuing to compare himself to her in practice. Although the jury's verdict implies that it found this comparison persuasive, and although we must yield to the jury's credibility assessments and resolution of conflicts in the evidence, *see City of Keller*, 168 S.W.3d at 819–20, the jury could not change the law.

---

[17]Rose explained that, as a sales manager, Moss was "responsible for hitting [his] financial quota and number every year, [the] number set for the location[,] as well as scheduling and head count of the team[,] as well as training the staff[,] as well as going on joint sale[s] calls with . . . his staff." Tina, as an assistant sales manager, was "responsible for selling just like the rest of the other counselors" (i.e., salesmen), she "ha[d] a quota," and she "assist[ed] the sales manager with duties" as needed. The manager (Moss) supervised the assistant manager (Tina) and the sales team, while the assistant manager did not supervise anyone.

14

## 2. Non-Comparator Evidence

Nonetheless, Moss argues that, even without a comparator, he offered sufficient non-comparator evidence of SCI's discriminatory motivation. He points to four aspects of his case in particular: (1) his bosses' remarks about not disciplining or firing black females; (2) the fact that Tina was not disciplined for insubordination when he complained but was fired when a black female complained; (3) SCI's replacement of him with a black female; and (4) SCI's failure to fully investigate his breast-photo comment.[18] As we shall see, though, Moss's unspoken reliance on Tina as a comparator sidetracked much of this evidence, so even assuming that he could have proven discrimination as a motivating factor with non-comparator evidence, he failed to do so.

---

[18]Moss also claims that SCI gave shifting reasons for his termination, arguing that it "repeatedly represented" that a prior incident with Tina—in which he referred to her using an expletive and did so loudly enough to be heard by a grieving family in another room—also contributed to SCI's decision to fire him. Moss points to SCI's discussion of the prior incident at trial, noting that the incident was mentioned in cross-examination and in SCI's closing argument. But while SCI presented evidence of the prior incident at trial, none of its witnesses claimed that Moss had been fired because of that incident, and Moss acknowledges as much in other portions of his appellate brief.

### a. Bosses' Remarks[19]

A key component of Moss's motivation-related evidence was his bosses' set of remarks about not disciplining or firing Tina because she was a black female. Moss argues that these remarks revealed that SCI "bas[ed its] employment decisions on race and [sex]."[20]

But "[s]tatements and remarks may serve as evidence of discrimination only if they are (1) related to the employee's protected class, (2) close in time to the employment decision, (3) made by an individual with authority over the employment decision, and (4) related to the employment decision at issue." *AutoZone*, 272 S.W.3d at 593; *Paul*, 2023 WL 4779480, at *5. Several of these elements are on shaky footing when applied to the bosses' remarks, but none more so than the final element: the statements' connection to the employment decision at issue.

When comments are not directly connected with a termination decision, they may be considered "stray remarks," and such "stray remarks" will not raise a fact issue as to the reason for termination. *AutoZone*, 272 S.W.3d at 592–93; *see Moore v. United*

---

[19]The parties dispute whether the bosses' remarks qualified as direct or indirect evidence of intent, but we hold that they were no evidence of intent, so we need not categorize them.

[20]Moss was the only witness to testify to such remarks; the bosses denied them. However, the jury was entitled to believe Moss's testimony over that of his bosses. *See Bell Helicopter*, 552 S.W.3d at 913 (recognizing that the factfinder may "accept or reject all or any part of [a witness's] testimony").

*Parcel Serv., Inc.*, 150 Fed. App'x 315, 318 (5th Cir. 2005) ("Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent . . . ." (quoting *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999))). Here, the bosses' remarks—that SCI was "not going to move [Tina], and [it was] not going to fire her because she [wa]s a black female" who "will sue"—related to Tina's discipline rather than to Moss's termination. Moss did not sue SCI for its failure to address Tina's performance issues; he sued to recover for his termination. And it was this action—his termination—for which the jury was asked to determine the motivating factors. Because Moss's termination was temporally and contextually separated from the bosses' statements about Tina's discipline—and it came immediately after Moss made a breast-photo comment unrelated to Tina's performance issues—those statements are considered "stray remarks" that do not raise a fact issue regarding the motivation for SCI's decision to fire Moss following his breast-photo comment. *See Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 404–06 (5th Cir. 2001) (affirming summary judgment rejection of race-discrimination claim and holding that superintendent's year-old statement that he had "a problem . . . with past black coaches, and if there was another problem, . . . he would do his best to get rid of [the teacher]" was a stray remark not related to teacher's ultimate termination and insufficient to raise fact issue); *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345–46 (5th Cir. 2005) (concluding that employer's "pro-Indian remarks d[id] not create a fact issue on pretext" when employee failed to present evidence that pro-

Indian remarks "were made in connection with his discharge" or that employer did not also fire Indians for performance issues); *Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 729–30 (Tex. App.—Fort Worth 2006, no pet.) (holding racial comments that were not related to employee's termination were insufficient to raise fact issue on pretext); *Arguello-Gilliand v. Brinker Int'l, Inc.*, No. 05-02-01402-CV, 2003 WL 21185484, at *3 (Tex. App.—Dallas May 21, 2003, no pet.) (mem. op.) (affirming summary judgment rejection of race-discrimination claim and holding that alleged "offensive racial comments" made to plaintiff were stray remarks insufficient to raise a fact issue on pretext in part because the comments did not relate to the employment decision at issue). Such stray remarks cannot provide a basis to support the judgment.

### b. Tina's Delayed Discipline and Termination

Moss next points to SCI's disregard of his complaints about Tina's behavior, which he contrasts with SCI's later willingness to fire Tina when similar complaints were vocalized by his black female replacement. But once more, such emphasis ignores the employment decision at issue.

Tina's delayed discipline may have supported the idea that Moss's complaints about her had not been taken seriously, but Moss was seeking to recover for his own termination—not for SCI's failure to immediately terminate Tina in response to his complaints. The question for the jury was whether Moss's race or sex was a "motivating factor" in his termination, and Tina's allegedly delayed discipline proves nothing in this regard.

18

### c. Moss's Replacement with Black Female

Moss next claims that SCI's discriminatory motivation for firing him was demonstrated by its replacing him with a black female.

However, "[w]hile the fact that one's replacement is of another [race or sex] 'may help to raise an inference of discrimination,'" it is not necessarily sufficient, standing alone, to support a jury finding of discrimination. *Byers v. Dal. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996), and stating that a replacement's membership in a plaintiff's protected class is "material" but "not outcome determinative"); *see Carson*, 82 F.3d at 159 (reviewing summary judgment rejection of race-discrimination claim and emphasizing that the "question . . . is whether the plaintiff has established a logical reason to believe that the [adverse employment] decision rests on a legally forbidden ground" so a replacement's non-membership in a plaintiff's protected class "is neither a sufficient nor a necessary condition"). Indeed here, the equal inference rule precludes us from giving any weight to this evidence. *See Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013) ("[T]he equal inference rule . . . provides that a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'"); *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) (recognizing that "when the evidence equally supports two alternatives" it is "no more than a scintilla and, in legal effect, is no evidence"). Although Moss was replaced with a black female, there was scant

evidence of his replacement's selection or performance. So while the fact that Moss was replaced with a black female could lead to an inference that discrimination had occurred, another inference, e.g., that Moss's replacement was hired not because of her race or sex but because of her qualifications for the position, would be equally plausible. Without more evidence regarding the circumstances surrounding the choice of Handley-Jones as Moss's replacement, the jury was simply not free to choose one inference over the other. *See United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 642 (Tex. 2023) (reiterating that "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred" and "[j]urors may not simply speculate that a particular inference arises," as such speculation "amounts to nothing more than a guess"); *City of Keller*, 168 S.W.3d at 813, 821 (similar). In the context of this case, and without additional evidence regarding Handley-Jones's selection or termination, Moss's replacement with a black female was no evidence that SCI's firing of Moss had been motivated by his race or sex. *Cf. O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13, 116 S. Ct. 1307, 1310 (1996) (emphasizing in age-discrimination case that a replacement's differing characteristics or class status is relevant when the evidence of such difference is "adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion" (emphasis removed)).

Furthermore, one of the few things the evidence showed about Moss's replacement was that she was subsequently fired. Moss himself testified to this fact.

20

If anything, then, the evidence surrounding Moss's replacement would seem to negate any inference that SCI ignored the conduct of black females while firing white males.

The bare fact that Moss was replaced with a black female did not allow the jury to infer that his race or sex was a motivating factor in his termination.

### d. SCI's Investigation of Breast-Photo Comment

Finally, Moss claims that SCI's cursory investigation of his breast-photo comment reflected that the comment was not the true reason for his termination. He notes SCI's failure to formally interview witnesses, to seek his side of the story, and to generate official documentation, and he claims that SCI "exaggerate[ed] . . . what was said and the context in which it was said" based on other witnesses' accounts.

But the allegedly lackluster nature of SCI's investigation is immaterial. First, Moss admitted making the breast-photo comment, so while he takes issue with the extent of SCI's investigation, with his admission, he can hardly claim that a more thorough investigation would have revealed a factually false premise. *Cf Wal-Mart*, 121 S.W.3d at 740 (recognizing that "the falsity of the reasons the defendant puts forth may, together with the elements of the prima facie case, suffice to show intentional discrimination" (internal quotation marks omitted)). It was undisputed that Moss had suggested that Tina—a subordinate who reported to him—take before-and-after photographs of her breast-reduction surgery for posting on SCI's intranet site. And it was undisputed that, at a minimum, Moss's comment was made in a sufficiently public area of the office that it could be (and was) overheard by other

21

members of his sales team, including three other women who reported to him.  Even

Moss acknowledged that his breast-photo comment warranted some sort of

disciplinary action; he simply disputed what that action should have been.[21]  *See*

*Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1185–86 (5th Cir. 1997) (reversing race-

discrimination judgment, holding that plaintiff failed to show tardiness was pretext for

discriminatory discipline, and noting that plaintiff never denied tardiness).  Given

Moss's admission that he made the breast-photo comment, the lack of additional

investigation by SCI is no evidence of pretext.

Second, and more importantly, even if an extensive investigation would have

produced a different outcome, Moss "still bore the ultimate burden to prove that [SCI

had] discriminated against him because of his [race, sex, or both]."  *Wal-Mart*, 121

S.W.3d at 740 (rejecting challenges to "the quality of [the employer's] investigation"

and noting that such evidence "d[id] not, by itself, prove that [the plaintiff's disability]

was a motivating factor in his termination").  "[I]t is not sufficient for [an employee]

to present evidence that the [employer's] investigation was imperfect, incomplete, or

---

[21]Moss opined that "coaching" would have been more appropriate than termination.  *Cf. Weeks v. Tex. A & M Univ. Sys. at Galveston*, 762 Fed. App'x 203, 205 (5th Cir. 2019) (affirming rejection of sex-discrimination claim and noting that "pretext cannot be established by mere conclusory statements" and requires "something more than subjective belief"); *Paul*, 2023 WL 4779480, at *9 ("[S]ubjective beliefs and unsupported allegations discounting [an employer's] proffered reasons for its adverse employment action do not raise genuine issues of material fact regarding pretext.").

arrived at a possibly incorrect conclusion[; rather, h]e must show that . . . discrimination was the real reason" for his termination. *Id.* (internal quotation marks omitted) (noting further that "[a]n at-will employer does not incur liability for carelessly forming its reasons for termination"). Here, nothing about SCI's investigation or alleged lack thereof indicated that SCI was motivated by Moss's race or sex; Moss's evidence simply did not connect the dots. *See id.* (holding evidence legally insufficient to support disability-discrimination verdict when employer cited harassment complaints as reason for termination).

### 3. Insufficient Comparator or Non-Comparator Evidence

For the reasons explained above, neither Moss's attempts to compare himself to Tina, nor his bosses' stray remarks, nor SCI's delayed discipline of Tina, nor its replacement of Moss with a later-fired black female, nor any perceived deficiency in SCI's investigation allowed a reasonable jury to infer that Moss's race or sex had been a "motivating factor" in SCI's decision to fire him following his breast-photo comment. We sustain the dispositive portions of SCI's first two issues.

And because this holding is dispositive, we need not address SCI's remaining issues.[22] *See* Tex. R. App. P. 47.1.

---

[22]SCI's remaining issues challenge (1) the legal and factual sufficiency of the evidence to support the amount of backpay awarded; and (2) the reasonableness of the hourly rates underlying Moss's award of attorney's fees.

### III. Conclusion

There was legally insufficient evidence that Moss's race or sex was a motivating factor in SCI's decision to fire him and that the breast-photo comment was merely a pretext. We reverse the trial court's judgment and render judgment that Moss take nothing on his discrimination claims. *See* Tex. R. App. P. 43.2(c).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: March 20, 2025